

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00176-CV

———————————————

ANTHONY A. RIEDER, ED RAPEE III, AND CADBURY SOLUTIONS, LLC,
Appellants

V.

ALAN MEEKER, Appellee

and

ANTHONY A. RIEDER AND ED RAPEE III, Appellants

V.

CQUENTIA SERIES, LLC, Appellee

and

KENNY WOODS, Appellant

V.

ANTHONY A. RIEDER, ED RAPEE III, AND CADBURY SOLUTIONS, LLC,
Appellees

---

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-288556-16

---

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION ON REMAND

### I.    Introduction

This special-appearance appeal is on remand from the Supreme Court of Texas after that court granted the petition for review filed by Appellants and Appellees Anthony A. Rieder, Ed Rapee III, and Cadbury Solutions, LLC (collectively, Defendants) and reversed this court's judgment. *See Rieder v. Woods*, 603 S.W.3d 86, 102 (Tex. 2020). Defendants filed a special appearance contesting the trial court's personal jurisdiction over them for the claims brought against them by Cross-Appellant Kenny Woods, and they supplemented their special appearance to address the claims brought against them by Appellees Alan Meeker and CQuentia Series, LLC (collectively, Intervenors), who had intervened in Woods's suit. The trial court granted the special appearance as to Woods but denied it as to Meeker and CQuentia. On appeal, this court held that an agreement with a forum selection clause between Cadbury and CQuentia should be read together with another agreement as a single, unified instrument and that the forum selection clause applied to all claims against Defendants. The supreme court reversed this court's judgment and remanded the case to this court to address the parties' issues that we had not previously reached. *Id.* Those unaddressed issues are (1) whether Defendants are estopped from challenging enforcement of the forum selection clause against them by nonsignatories (Woods's fourth issue), and if not, (2) whether Defendants' contacts with Texas give rise to personal jurisdiction (Woods's fifth issue and Defendants' first two issues), (3) whether justice and equity

3

counsel against the exercise of jurisdiction over Defendants (Woods's sixth issue), (4) whether Defendants made a general appearance as to all parties and claims (Woods's seventh issue), and (5) whether CQuentia's claim against Cadbury (as brought by Meeker) should be severed and abated (Defendants' third issue). Because we hold that the trial court has personal jurisdiction only over Cadbury for one of the claims against it—for Meeker's claim on behalf of CQuentia for a declaratory judgment regarding his right to terminate the agreement between CQuentia and Cadbury—but does not have jurisdiction over any of the Defendants for the remaining claims, we reverse in part and remand the one claim against Cadbury.

## II. Factual and Procedural Background

From the parties' pleadings and jurisdictional evidence, we draw the following facts. Wisconsin residents Rieder and Rapee formed Care Integrations LLC for the purpose of providing telemedicine services. After a consultant introduced them to Woods, they discussed hiring Woods as a consultant as well.

Woods had a business relationship with Meeker, a Texas resident and CEO of CQuentia, and Woods told Meeker about Rieder and Rapee's telemedicine business. After that discussion, Woods went to Rieder and Rapee with the idea that they work with CQuentia to distribute its genetic-testing services.[1]

---

[1]In the trial court, Meeker and Woods both used as jurisdictional evidence an email from Rieder saying that his and Rapee's working with CQuentia had been Meeker's idea. Meeker's affidavit, on the other hand, could be read as saying that the idea had come from Woods; Meeker stated in the affidavit that he and Woods began

4

Rieder, Rapee, and Woods purportedly formed Cadbury as a Nevada limited liability company by executing the Cadbury Operating Agreement, effective as of February 1, 2016. Also on February 1, 2016, Cadbury and CQuentia signed the "Declaration of Series for CQuentia Series, LLC: Cadbury Solutions Series" (the CQ Agreement), which formed a series limited liability company for the purpose of selling and distributing DNA-testing services. *See* Tex. Bus. Orgs. Code Ann. § 101.601. Woods signed on behalf of Cadbury, and Meeker signed for CQuentia. Under that agreement, CQuentia would perform laboratory services at its Tennessee lab (or other locations as determined by CQuentia), and Cadbury would provide marketing and sales for those services. Meeker and Woods were listed as managers of the entity formed under the agreement. The agreement contained a forum selection clause:

> ANY CLAIMS OR CONTROVERSIES UNDER OR RELATED TO THIS AGREEMENT SHALL BE EXCLUSIVELY DETERMINED IN THE STATE AND/OR FEDERAL COURTS LOCATED IN TARRANT COUNTY, TEXAS, TO WHOSE JURISDICTION EACH PARTY IRREVOCABLY CONSENTS.

The parties' new business relationship soon fell apart. In September 2016, Meeker sent a letter to Woods, Rieder, and Rapee telling them that CQuentia had, in its sole discretion, terminated the CQ Agreement with Cadbury but that CQuentia would

---

discussing Woods's helping Meeker with his DNA-testing business, and after they "began working together in that effort," Woods introduced him to Rieder and Rapee. Whether the idea to work with Rieder and Rapee to sell CQuentia's services originated with Meeker or with Woods, there is no dispute that the idea did not come from Rieder or Rapee.

accept proposals from any of the three who wanted to continue working with CQuentia. In response, Cadbury's Wisconsin attorney sent a letter maintaining that the CQ Agreement had not been properly terminated and that none of Cadbury's members could submit a proposal to CQuentia without violating their fiduciary duties to Cadbury and the terms of the Cadbury Operating Agreement. The attorney also sent a letter to Woods telling him that Cadbury would take legal action against him if he violated his obligations to Cadbury. Woods took that letter to CQuentia, and CQuentia's general counsel responded with a letter to Cadbury's attorney stating that the CQ Agreement had been properly terminated and that Woods owed no fiduciary or contractual obligations to Cadbury.

The next month marked the beginning of a series of lawsuits. First, Woods sued Defendants in Tarrant County, Texas, for fraud, breach of contract, and tortious interference, and for declarations that Cadbury was not a valid entity and had never approved the CQ Agreement. Defendants responded by filing a special appearance and, alternatively, motion to dismiss for forum non conveniens. In November 2016, Cadbury sued Woods and Meeker in Wisconsin. Cadbury sued Woods for breach of the Cadbury Operating Agreement; breach of the covenant of good faith and fair dealing and his fiduciary duty to Cadbury; and usurpation of Cadbury's corporate opportunities, and it sought declarations that Cadbury is a viable entity and that the Cadbury Operating Agreement is valid. Against Meeker, Cadbury pleaded claims for tortious interference with the CQ Agreement and Cadbury's prospective contracts and

6

for injuring Cadbury's business in violation of a Wisconsin statute. Meeker and CQuentia then each filed a plea in intervention in the Texas proceeding originally filed by Woods. Meeker sought two declaratory judgments: (1) that he and any entity he operates can utilize Woods's services without violating the Cadbury Operating Agreement and incurring contractual liability to any of the Defendants and (2) that as CQuentia's manager, he could terminate the CQ Agreement. CQuentia sued Rieder and Rapee[2] for fraud, fraudulent inducement, and negligent misrepresentation.

Shortly after the pleas in intervention were filed, Defendants filed an amended special appearance; while the filing acknowledged that "CQuentia ha[d] sought to intervene" to sue Rieder and Rapee and asserted that the intervention did not "invoke[ ] the forum selection clause" of the CQ Agreement, it did not specifically address Intervenors' jurisdictional allegations or explain why those allegations did not support jurisdiction over Defendants. Defendants later filed a supplemental special appearance in which they argued that they did not need to file a separate special appearance as to Intervenors because the amended special appearance's assertions disputing jurisdiction applied equally to Intervenors' alleged bases for jurisdiction, but also in which, out of an abundance of caution, they supplemented their amended special appearance to

---

[2]Although CQuentia's petition names all three Defendants as parties to the underlying suit, it alleges specific wrongdoing only by Rieder and Rapee. *See Rieder*, 603 S.W.3d at 101 n.69.

7

specifically address why a Texas court lacked jurisdiction to hear Intervenors' claims against them.

In the time period between Defendants' amending their special appearance and their supplementing it, Meeker attempted to conduct discovery on the merits. In response, Defendants filed two motions entitled "Subject to Their Special Appearance, Defendants['] Motion to Quash" and "Subject to Their Special Appearance, Defendants['] Objections to . . . Meeker's Written Discovery, Motion for Protective Order, and Motion to Quash." The motions argued that Meeker's discovery requests were "unrelated to the jurisdictional issues" raised in their special appearance and instead related "to the heart of" Meeker's claims and that the requested discovery was therefore not available under Rule 120a. *See* Tex. R. Civ. P. 120a. After a hearing, the trial court granted the motions and limited discovery to matters related to jurisdiction. Relying in part on emails produced in that discovery, Woods and Intervenors filed responses to Defendants' special appearance.

At the hearing on the special appearance, the trial court found that it had no personal jurisdiction over Defendants for Woods's claims but that it did have jurisdiction over them for Intervenors' claims based on "specific jurisdictional facts . . . of allegations against [Rieder and Rapee for] making representations directed toward Texas [via telephone calls] that are alleged to be fraudulent." The trial court subsequently signed an order denying the special appearance and forum non conveniens

8

motion as to Intervenors' claims but granting it as to Woods's claims and dismissing his claims with prejudice.[3]

Woods and Defendants appealed. Defendants raised three issues, while Woods asserted eight. In our previous opinion, based on our conclusion that the Cadbury Operating Agreement and the CQ Agreement should be read together, we held that the CQ Agreement's forum selection clause was enforceable by and against the nonsignatory parties under the "closely related" and "transaction-participant" doctrines and that the claims asserted by Woods and Intervenors fell within the clause's scope. *Rieder*, 587 S.W.3d at 46, 48, 50, 52, 54–56. Disagreeing with our conclusions, the Texas Supreme Court reversed and remanded the case for this court to address the parties'

---

[3]In our previous opinion, we overruled Defendants' alternative forum non conveniens arguments and sustained Woods's eighth issue addressing the forum non conveniens grounds. We did so, however, based on the applicability of the forum selection clause to those claims. *Rieder v. Meeker*, 587 S.W.3d 32, 43–44 (Tex. App.—Fort Worth Oct. 18, 2018) (mem. op.), *rev'd sub nom.*, *Rieder*, 603 S.W.3d at 102. We now hold that the forum selection clause applies only to Meeker's second declaratory judgment claim, and, accordingly, our previous determination of the forum non conveniens arguments no longer applies to the rest of the claims against Defendants. Nevertheless, on remand of the appeal we do not reach Woods's eighth issue or Defendants' forum non conveniens arguments as to those claims. Because we sustain the trial court's dismissal of Woods's claims on other grounds, we overrule Woods's eighth issue as moot. Likewise, in light of our disposition of the other issues on appeal, Defendants' forum non conveniens arguments are moot, and we deny their request for mandamus relief. *See In re ENSCO Offshore Int'l Co.*, 311 S.W.3d 921, 923 (Tex. 2010) (orig. proceeding) (holding mandamus relief may be granted for denial of motion to dismiss on forum non conveniens); *Martinez v. Bell Helicopter Textron, Inc.*, 49 S.W.3d 890, 891 (Tex. App.—Fort Worth 2001, pet. denied) (per curiam) (holding interlocutory appeal unavailable for denial of motion to dismiss on forum non conveniens).

issues that we had not previously addressed and which we itemized in this opinion's introduction. *Rieder*, 603 S.W.3d at 102.

### III. Waiver and Estoppel

In addition to Woods's traditional personal jurisdiction argument, he raises preliminary issues—waiver and direct-benefits estoppel—that, if sustained, would moot the traditional personal jurisdiction issue. Intervenors make essentially the same waiver arguments that Woods makes, and Meeker adopts Woods's estoppel arguments. We begin our analysis with these waiver and estoppel arguments.[4]

### A. Defendants did not waive their special appearance or make a general appearance.

Woods addresses waiver in his seventh issue, in which he uses a two-step argument to assert that Defendants made a general appearance as to his claims and thus waived any objection to an exercise of jurisdiction over them by a Texas court. First, he argues that Defendants violated the due-order-of-pleading requirement and thereby made a general appearance as to Intervenors' claims because they moved to quash Meeker's discovery requests before they supplemented their amended special appearance to specifically address Intervenors' claims. Second, he argues that his claims

---

[4]Defendants address Woods's arguments in their appellees' brief, and, in their appellants' brief, they address the trial court's jurisdiction over them for Intervenors' claims. Specifically, their first issue addresses the trial court's jurisdiction over them for CQuentia's claims, and their second issue addresses Meeker's claims. Thus, while addressing these preliminary issues, we also dispose of the parts of Defendants' issues related to these arguments.

are not severable from Intervenors' claims and therefore that the general appearance as to Intervenors' claims also constituted a general appearance as to his.[5] Woods also contends that the rule on which Defendants relied in the trial court—that a party does not waive a special appearance by seeking a ruling on a discovery dispute before the special appearance is heard—does not apply here because that rule applies only when a special appearance has already been filed against the party seeking discovery.[6] We disagree with the first premise of Woods's argument that the motions to quash constituted a general appearance and do not reach the second.

Civil Procedure Rule 120a provides a "special appearance" procedure by which a party may make a limited appearance in a case for the purpose of challenging personal jurisdiction. Tex. R. Civ. P. 120a. Under this rule, discovery does not constitute a general appearance or a waiver of a special appearance, and other pleadings and motions may be filed without entering a general appearance so long as they are made subject to the special appearance. *See id.*; *Int'l Turbine Serv., Inc. v. Lovitt*, 881 S.W.2d 805, 808–09 (Tex. App.—Fort Worth 1994, writ denied). But a party who enters an appearance not in compliance with Rule 120a waives that party's special appearance. *McCoy v. Platinum*

---

[5]Woods and Intervenors argue—perhaps irreconcilably—that Defendants' amended special appearance did not apply to Intervenors' claims because Intervenors' claims and Woods's claims arise from different jurisdictional facts but also argue that their claims are not severable for due-order-of-pleading purposes because they arise from the same facts and issues.

[6]Intervenors make these same arguments in their appellees' brief.

11

*Power Moves, Inc.*, No. 01-17-00653-CV, 2018 WL 3581021, at *3 (Tex. App.—Houston [1st Dist.] July 26, 2018, no pet.) (mem. op.). The test for whether a party has made a general appearance by filing a motion or participating in a hearing on the motion is simply this: after filing a special appearance, did the party request affirmative relief from the trial court that is inconsistent with the party's assertion that the court lacks jurisdiction? *See Dawson-Austin v. Austin*, 968 S.W.2d 319, 323 (Tex. 1998); *Abshire v. Pannell*, No. 01-19-00710-CV, 2020 WL 3820912, at *4 (Tex. App.—Houston [1st Dist.] July 7, 2020, pet. filed) (mem. op.).

Before Meeker and CQuentia intervened, Defendants had filed their special appearance and nothing else. After the pleas in intervention were filed and before Defendants filed their supplemental special appearance, Defendants filed their amended special appearance and their motions seeking to quash Meeker's discovery. The motions argued that Meeker's discovery requests should be quashed because Defendants had objected to the trial court's exercise of jurisdiction over them and that Meeker could therefore obtain discovery only as to the jurisdictional issues raised in their special appearance.[7] Defendants' motions to quash contested jurisdiction, were

---

[7]Defendants also filed a motion to sever CQuentia's misrepresentation claims, if any, against Cadbury, which they filed subject to their special appearance and in which they argued that the trial court should dismiss Defendants for want of personal jurisdiction but that *if* CQuentia had asserted a claim against Cadbury that would be governed by the forum selection clause, the court should sever that claim and abate it until resolution of Cadbury's Wisconsin suit. Woods and Intervenors do not argue that this motion constituted a general appearance. *See, e.g., HMS Aviation v. Layale Enters., S.A.*, 149 S.W.3d 182, 189 (Tex. App.—Fort Worth 2004, no pet.) (holding motion to

filed "subject to" their special appearance, and were entirely consistent with the special appearance. The motions did not acknowledge or concede the court's jurisdiction over them and did not seek affirmative relief unrelated to their special appearance or inconsistent with their position that the trial court did not have jurisdiction over them. The only relief that they requested—that discovery unrelated to the jurisdictional issues not be compelled before the trial court's ruling on the special appearance—was consistent with that position. *See Dawson-Austin*, 968 S.W.2d at 322; *see also Exito Elecs. Co., Ltd. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004) (describing *Dawson-Austin*'s test for a general appearance as whether a party "(1) invokes the judgment of the court on any question other than the court's jurisdiction, (2) recognizes by its acts that an action is properly pending, or (3) seeks affirmative action from the court").

Because Defendants' motions to quash did not seek from the trial court affirmative relief unrelated to their special appearance and did not recognize that any claims against them were properly pending, the motions did not constitute a general appearance as to Intervenors' claims. And because they did not make a general appearance as to Intervenors before filing their supplemental special appearance specifically addressing Intervenors' claims,[8] they did not make a general appearance as

increase sequestration bond did not waive a special appearance because it was filed "subject to" the pending special appearance and the trial court ruled on the special appearance before hearing or ruling on the sequestration bond motion).

[8]Woods relies on correspondence between Intervenors' attorney and Defendants' Texas attorney to support his general appearance argument. Intervenors'

13

to Woods, regardless of whether his claims and Intervenors' are severable. *See* Tex. R. Civ. P. 120a (providing that special appearance motion may be amended). We overrule Woods's seventh issue, and we sustain Defendants' first two issues on this point.[9]

---

attorney wrote to Defendants' to confirm that for the hearing on Defendants' motion for protective order and motion to strike, his understanding was that they would submit briefs three days ahead of the hearing and that "the briefs [were] to concern whether Defendants' Special Appearance as to Plaintiff Woods's claims limit[ed] the discovery available to Intervenors, against whom Defendants have not specially appeared." Defendants' attorney's email response said, "Thanks, Bill. Good to meet you too. Your letter fairly and accurately reflects what I recall as well." But this letter does not constitute a judicial admission, *see Horizon/CMS Healthcare v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000) (defining judicial admission), and in the context of Defendants' attorney's briefs and arguments at the hearing on the motion for protective order and motion to quash, Defendants' position appeared to be not that Defendants were not specially appearing as to Intervenors but that they did not need to file a separate special appearance because the interventions did not change the fact that the trial court did not have personal jurisdiction over Defendants and that the amended special appearance applied equally to Intervenors' claims.

[9]Intervenors argued in their appellees' brief that we must affirm the trial court's order denying the special appearance as to their claims because Defendants' appellants' brief does not challenge the general appearance argument as to Intervenors. Broadly and liberally construing Defendants' issues and arguments on appeal—including their position that the trial court had no jurisdiction over them and that they filed a special appearance as to the entire lawsuit; that their motion for protective order was filed subject to their special appearance; that the trial court erred by denying that special appearance as to Intervenors; and that Meeker's representative claim on behalf of CQuentia against Cadbury should be severed from the remaining claims of Meeker and CQuentia against Rieder and Rapee; as well as their pointing out that the trial court granted in part their motion for protective order based on their argument that they could not be forced to conduct merits-based discovery before a ruling on their special appearance—we conclude that their first two issues fairly included an argument that they did not make a general appearance, and we sustain that part of those issues. *See* Tex. R. App. P. 38.1(f) (requiring appellate courts to treat an issue as covering every subsidiary question that is fairly included); *Traweek v. Long*, No. 02-20-00311-CV, 2021 WL 733085, at *3–4 & n.1 (Tex. App.—Fort Worth Feb. 25, 2021, no pet. h.) (mem. op.) (noting that we must liberally and reasonably construe briefs, considering the

14

**B.      Estoppel does not bar Defendants from challenging jurisdiction.**

Woods's fourth issue challenges the trial court's failure to apply direct-benefits estoppel to enforce the forum selection clause in the CQ Agreement between Cadbury and CQuentia against Defendants for his claims; in other words, Woods asserts that the trial court erred in sustaining Defendants' jurisdictional objections directed at Woods's claims because they were estopped to deny the power of the forum selection clause to force them to litigate in Tarrant County.    Intervenors adopt Woods's estoppel arguments as to Meeker's plea in intervention; therefore, we also address estoppel as to those claims.    As we noted in our prior opinion, we review a trial court's decision on whether to enforce a forum selection clause for an abuse of discretion, but we review the trial court's legal determinations de novo.    *Rieder*, 587 S.W.3d at 39–40.

**1.      Meeker's Claims**

Before reviewing Woods's arguments, we first address estoppel as to Meeker because our resolution of his claims does not rely on the merits of Woods's estoppel argument.  On appeal, Intervenors do not include an estoppel section in their brief, but they incorporate Woods's brief's arguments about the applicability of the forum selection clause.    And in his brief, Woods argues that estoppel makes the forum

---

parties' arguments, evidence, and citations, in order to resolve appeals on the merits and not on procedural defects and citing *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732–33 (Tex. 2020); *St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 214 (Tex. 2020); and *Horton v. Stovall*, 591 S.W.3d 567, 569 (Tex. 2019)).

selection clause applicable both to his and to Meeker's claims (but not CQuentia's). We therefore read Intervenors' appellees' brief to argue estoppel as an alternative basis for affirming the trial court's order that overruled Defendants' jurisdictional arguments as to Meeker.[10]

Before applying a contract's forum selection clause, we must first determine that the clause is enforceable and that it encompasses the claims at issue. *Carlile Bancshares, Inc. v. Armstrong*, Nos. 02-14-00014-CV, 02-14-00018-CV, 2014 WL 3891658, at *6 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.). As a general rule, a contract's terms may be enforced only by and against its parties. *See First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017); *El Paso Cmty. Partners v. B & G/Sunrise Joint Venture*, 24 S.W.3d 620, 626 (Tex. App.—Austin 2000, no pet.) ("[G]enerally someone who is not a party to an agreement has no interest in the terms of that contract.").

---

[10]Similarly to their approach on appeal, in the trial court, Intervenors did not explicitly argue in their special appearance response that estoppel made the forum selection clause enforceable for their claims, but they incorporated Woods's special appearance response, which argued that estoppel applied to both his and Meeker's claims. The trial court appeared to reject Woods's estoppel theory at the hearing, and it then implicitly overruled the estoppel argument in its order when it granted the special appearance as to Woods. Because on appeal Meeker does not seek more favorable relief than he received in the trial court, he was not required to file a notice of appeal in order to ask this court to overrule the trial court's estoppel determination. *See* Tex. R. App. 25.1(c). In their brief, Intervenors appear to adopt Woods's estoppel argument for CQuentia's claims against Rieder and Rapee, but neither they nor Woods argued in the trial court that it applied to those claims. Additionally, the estoppel argument is based in part on the suit in Wisconsin and related demand; CQuentia is not a party to that suit.

16

Estoppel has no relevance to Meeker's first claim seeking a declaration related to the validity of the Cadbury Operating Agreement. Under the CQ Agreement's respective forum selection clauses, the parties consented to jurisdiction in Texas for claims "under or related to" that agreement. But Meeker's first declaratory judgment claim relates only to the Cadbury Operating Agreement, not to the CQ Agreement. His plea in intervention asserted that

> Meeker . . . learned that Cadbury itself had never begun operations; despite being allegedly formed in [or] on February 1, 2016, by September 2016 it had never had a board meeting, created a budget, or maintained corporate books and records. In fact, it appears that Cadbury purported to enter the Cadbury Series Agreement with CQuentia *before* Cadbury's operating agreement was even executed.
>
> . . . .
>
> . . . After CQuentia terminated the Cadbury Series, Woods received a letter from Cadbury's counsel threatening him with various infractions if he continued any relationship with CQuentia arising from a restrictive covenant contained in Paragraph 12 of Cadbury's operating agreement. Woods shared the letter with CQuentia, whose general counsel requested certain documents from Cadbury's lawyer directed at determining whether that agreement was enforceable, such as: documents reflecting board member elections, board authorizations for entering the [CQ Agreement], and corporate records establishing initial capital contributions. Rapee and Rieder never provided the documents.

Based on these allegations, Meeker sought a declaration that "he and any entity he operates ha[ve] the right to utilize Woods'[s] services without incurring liability under Paragraph 12 of the Cadbury [O]perating [A]greement."[11]

---

[11]In the plea's prayer, Meeker asked for a declaration that he is not violating any contractual obligations to Rieder, Rapee, or Cadbury, but it is not clear from his

17

Even if we were to hold that Meeker, a nonsignatory to the CQ Agreement, could rely on direct-benefits estoppel to force Defendants to defend in Texas any claim he brings relating to that agreement, such a holding would not require litigating *this* claim in Texas because the Cadbury Operating Agreement is separate from and independent of the CQ Agreement.[12]  *See Rieder*, 603 S.W.3d at 102; *see also G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 529 (Tex. 2015); *Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby*, 183 S.W.3d 891, 898 (Tex. App.—Austin 2006, orig. proceeding) (citing *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067–68 (5th Cir. 1998) for the proposition that "related to" contract language extends to disputes having a significant relationship to the contract or that "'touch' matters covered by" the contract).  Because Meeker's claim relates only to the Cadbury Operating Agreement and does not arise under or relate to the CQ Agreement,[13] the CQ Agreement forum

---

pleading that there is any dispute about whether he in his individual capacity has any contractual obligations to Rieder and Rapee in their individual capacities.  He does not argue that he is a party to the Cadbury Operating Agreement or any other contract with Rieder and Rapee and does not allege that Rieder and Rapee have claimed otherwise.  The only contract to which Rieder and Rapee were parties is the Cadbury Operating Agreement.

[12]We do not read Meeker's plea as asserting this claim on behalf of CQuentia, unlike his other declaratory judgment claim.  For our purposes, however, it does not matter in what capacity Meeker asserted this claim because even if it had been asserted on behalf of CQuentia, the claim is not a claim "under or related to" the CQ Agreement.

[13]Woods and Meeker argue that this first declaratory judgment claim relates to the CQ Agreement because Meeker could terminate the CQ Agreement if Cadbury was a nonentity, and, thus, proving Cadbury's nonexistence is a prerequisite to proving Meeker's second declaratory judgment claim expressly based on the CQ Agreement.

18

selection clause does not require that claim to be litigated in Texas. Accordingly, estoppel could not require this claim to be litigated here.

Estoppel is also inapplicable to Meeker's second declaratory judgment claim against Cadbury. We read the plea in intervention as asserting this claim in Meeker's capacity as CQuentia's manager rather than in his individual capacity. We recognize that in Meeker's response to Defendants' amended special appearance, he stated that he had "intervened in his own right" after Defendants had "threatened him with individual liability." But for this particular claim, he sought a declaration asking about his right "as Manager of CQuentia" to act under the CQ Agreement, not his right as an individual. He thus at least attempted to plead a claim on behalf of CQuentia. *See Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 896–97 (noting that "[a] petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim" and that "[t]he purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense"). Such a representative claim would therefore be by and against signatories to the CQ Agreement—Cadbury and CQuentia.[14] Further,

---

But we must abide by the Texas Supreme Court's conclusion that the Cadbury Operating Agreement is "separate from" and "beyond the reach" of the CQ Agreement. *Rieder*, 603 S.W.3d at 98.

[14]Rieder and Rapee did not sign and are not parties to the CQ Agreement. But to the extent that Meeker asserted this claim not just against Cadbury but also against Rieder and Rapee, estoppel does not apply because, as we explain below, we reject Woods's estoppel arguments, which Meeker adopted.

19

because Meeker requested a declaration about his right to terminate the CQ Agreement, the determination of the claim will require the trial court to consider the terms of that agreement. Thus, the claim "touches" matters covered by the CQ Agreement and therefore "relates to" that agreement. *See Kirby*, 183 S.W.3d 898 (noting "related to" forum-selection-clause language includes claims that "touch" the contract).

Although Defendants dispute that CQuentia made a claim against Cadbury, they acknowledge that any claim by CQuentia against Cadbury relating to the CQ Agreement falls within the scope of the forum selection clause.[15] Accordingly, under the forum selection clause's plain language, Cadbury has agreed that Texas courts have jurisdiction over it for that claim. Whether the claim was properly asserted by a party with the capacity to do so (Defendants argue that it was not) is not an issue in this appeal. *See 6200 GP, LLC v. Multi Serv. Corp.*, No. 05-16-01491-CV, 2018 WL 3154594, at *3 (Tex. App.—Dallas June 28, 2018, no pet.) (mem. op.) (noting that capacity is an affirmative

---

[15]Several months after signing the CQ Agreement, Cadbury, CQuentia, and Wisconsin business M3 Insurance Solutions, Inc. executed the "Declaration of Series for CQuentia Series, LLC: M3 Cadbury Series" (M3 Agreement). The M3 Agreement included a forum selection clause identical to the one in the CQ Agreement. Thus, had CQuentia asserted a claim against Cadbury that was related to the M3 Agreement, that claim would have to have been litigated in Tarrant County. But CQuentia made no claim against Cadbury other than the one asserted through Meeker. *Rieder*, 603 S.W.3d at 101 n.69. And while CQuentia's plea in intervention alleged that Rieder's and Rapee's representations induced it to sign both the CQ Agreement and the M3 Agreement, it did not argue in the trial court that estoppel applied to make the M3 Agreement's forum selection clause enforceable against Rieder and Rapee for its claims, nor were Woods's direct-benefits estoppel arguments related to the CQ Agreement applicable to Rieder and Rapee because they did not sue him or Meeker in Wisconsin.

20

defense); *cf. Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 779–81 (Tex. 2020) (stating

that whether a claim brought by a partner actually belongs to the partnership is a matter

of capacity that does not affect the trial court's subject matter jurisdiction and thus

should be decided on the merits). Estoppel is therefore irrelevant to this claim.

### 2. Woods's Claims

We now turn to Woods's argument that Defendants are estoped to deny the

effect of the forum selection clause in the CQ Agreement as to his claims against them.[16]

Woods is not a signatory to the CQ Agreement, and neither are Rieder and Rapee, but

Woods made several arguments for why he should nevertheless be permitted to enforce

its forum selection clause against Cadbury and nonparties Rieder and Rapee. Several

of those arguments were rejected by the Texas Supreme Court. *Rieder*, 603 S.W.3d at

101 (rejecting Woods's transaction-participant and "closely related" enforcement

---

[16]With respect to whether a forum selection clause encompasses Woods's claims, for purposes of our analysis, we assume that at least some of Woods's claims relate to the CQ Agreement. But at a minimum, two of his claims do not. His claim for a declaratory judgment about the validity of the Cadbury Operating Agreement does not. Like Meeker's similar declaratory judgment claim, Woods's claim was for a declaration that Cadbury never legally came into being and therefore he owed no obligations to Defendants under that agreement. This claim has no connection to the CQ Agreement. Likewise, his claim for breach of the Cadbury Operating Agreement relates only to the Cadbury Operating Agreement. As for Woods's other claims, whether they "relate to" the CQ Agreement (and therefore are encompassed by the forum selection clause) is a question we must resolve only if the forum selection clause may be enforced against Defendants via direct-benefits estoppel. Accordingly, because we find Woods's estoppel arguments unavailing, we need not analyze whether his other claims relate to the CQ Agreement.

arguments). On remand, we consider his only remaining unaddressed enforceability argument: direct-benefits estoppel.

Direct-benefits estoppel is an equitable doctrine under which an agreement's arbitration or forum selection clause becomes enforceable against a nonsignatory of the agreement because of the nonsignatory's knowing exploitation of the agreement. *Carlile*, 2014 WL 3891658, at *7–8. Typically, courts apply this doctrine to "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration [or forum selection] clause in the contract." *Id.* at *7 (quoting *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–18 (5th Cir. 2006)).

In general, courts seriously consider applying this doctrine to enforce a forum selection clause against a nonsignatory "only when 'the nonsignatory ha[s] brought suit against a signatory premised in part upon the agreement.'" *Id.* at *8 (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 362 (5th Cir. 2003)); *cf. G.T. Leach Builders*, 458 S.W.3d at 529 (stating that arbitration clause in developer's contract with general contractor could not be enforced by nonsignatory insurance brokers, subcontractors, and engineers in developer's suit against them because, even if the developer's claims "related to" its contract with the general contractor, his suit did not seek a direct benefit from that contract and instead sought benefits from his separate contracts with the defendants). But suing to enforce the contract is not the only way that a nonsignatory can "embrace" the contract and consequently be estopped from repudiating the

22

contract's forum selection clause; a nonsignatory also "embraces" the contract by otherwise knowingly seeking and obtaining direct benefits from the contract. *Carlile*, 2014 WL 3891658, at *7–8.

In his appellant's brief, Woods appears to argue that Defendants sought to benefit from the CQ Agreement by both methods. First, Woods quotes cases for the proposition that direct-benefits estoppel applies when a nonsignatory such as Rieder or Rapee embraces a contract during the life of the contract. While we construe his citations to these cases to argue that nonsignatories Rieder and Rapee benefited from the CQ Agreement outside of litigation, Woods does not detail in this section of the brief what direct benefit they knowingly sought and obtained from the contract. But elsewhere in his brief, Woods argues that they anticipated benefitting financially from the CQ Agreement. Further, the record contains copies of checks that CQuentia gave Cadbury for payments due under the CQ Agreement and an assertion in Woods's affidavit that Rieder withdrew "several thousand dollars" (presumably from Cadbury) to use in a separate business.

These alleged benefits do not support Woods's estoppel arguments, however, because they are not *direct* and substantial benefits of the CQ Agreement. *See In re Weekley Homes, L.P.*, 180 S.W.3d 127, 134 (Tex. 2005) (orig. proceeding) (stating that the doctrine does not apply when the alleged benefits are insubstantial or indirect); *cf. Carlile*, 2014 WL 3891658, at *8–9 (holding that defendants, who were shareholders and members of the board of directors of a bank and its holding company that merged with

23

another entity, were not bound under direct-benefits estoppel to a forum selection clause in the merger agreement because the proceeds they received in the merger were not a sufficient substantial benefit for estoppel purposes); *St. Clair v. Brooke Franchise Corp.*, No. 2-06-216-CV, 2007 WL 1095554, at \*7 (Tex. App.—Fort Worth Apr. 12, 2007, no pet.) (mem. op.) (holding that in St. Clair's suit for a declaration that she was not bound by a noncompete signed by her husband when he sold his insurance business, direct-benefits estoppel did not bind her to the arbitration clause in the sales agreement because although proceeds from her husband's sale of his business benefited her through an increase in the couple's community estate, this benefit was not direct and substantial enough to bind her to the arbitration clause). If these benefits to Rieder and Rapee related directly to any agreement, it would be the Cadbury Operating Agreement; Rieder and Rapee have received or anticipated benefits from the CQ Agreement only indirectly through their status as members of Cadbury. They have no direct claim for benefits under the CQ Agreement, and there is no allegation or evidence that they have insisted that others treat them as parties to that agreement. *See Weekley Homes*, 180 S.W.3d at 134–35 (stating that direct-benefits estoppel "requires a colorable claim to the [contract's] benefits" and that a nonparty cannot "consistently and knowingly insist[ ] that others treat it as a party" to a contract and then later "turn[ ] its back on the portions of the contract . . . it finds distasteful" (footnotes omitted)).

Turning to the second method of invoking direct-benefits estoppel, citing *In re Lisa Laser United States, Inc.*, 310 S.W.3d 880, 886 (Tex. 2010) (orig. proceeding), and

24

*Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 307 (Tex. 2006), Woods asserts that because

Cadbury is relying the CQ Agreement's terms to assert claims against Woods and

Meeker in Wisconsin, Cadbury must abide by the agreement's forum selection clause

not only in its Wisconsin suit, but also in Woods's suit here in Texas. And, he argues,

because nonsignatories Rieder and Rapee authorized the Wisconsin suit, they also must

comply with the forum selection clause for his claims here in Texas.

We decline to hold that Woods, as a nonsignatory and plaintiff in this action,

may enforce the forum selection clause against Defendants.[17] Whether a Wisconsin

court will agree with Woods that the forum selection clause applies to the claims

brought by Cadbury in that state is a matter for Wisconsin.[18] For this court, the question

is whether direct-benefits estoppel may be used by nonsignatory Woods as an offensive

tool to force nonsignatories Rieder and Rapee (and signatory Cadbury) to defend

---

[17]As we note, the doctrine generally applies when a signatory defendant moves to enforce an arbitration or forum selection clause against a nonsignatory plaintiff because the plaintiff has directly benefited from the agreement containing the clause. Courts have also sometimes applied the doctrine when the defendant is the nonsignatory and is seeking to force the signatory plaintiff to arbitrate the plaintiff's claims, and the signatory plaintiff was the party who embraced the contract during its life but repudiated its arbitration clause in litigation. *See, e.g.*, *Barantas Inc. v. Enter. Fin. Group Inc.*, No. 05-17-00896-CV, 2018 WL 3738089, at *8 (Tex. App.—Dallas Aug. 7, 2018, no pet.) (mem. op.). But Woods has cited us to no Texas case in which a court allowed a plaintiff to sue a defendant and then force the defendant to abide by a forum selection clause in an agreement that the plaintiff did not sign.

[18]Cadbury's Wisconsin suit against Woods and Meeker has been stayed while this appeal is pending. Cadbury did not name CQuentia, the other signatory to the CQ Agreement, as a defendant in that suit.

against claims here. The answer is no. "[T]he party position of the nonsignatory in the lawsuit—plaintiff or defendant—is an important distinction in deciding whether estoppel can bind a nonsignatory to a contract's terms." *Carlile*, 2014 WL 3891658, at *8. In other words, as this court has held, this form of estoppel applies when raised as a defense. *See id.* (stating that direct-benefits estoppel is "not a theory by which a signatory plaintiff may hold a nonsignatory defendant to the terms of a contract [that] the nonsignatory defendant is not seeking to enforce"); *cf. Kelly v. Rio Grande Computerland Grp.*, 128 S.W.3d 759, 769 (Tex. App.—El Paso 2004, no pet.) ("[E]quitable estoppel does not lend itself to an offensive posture.").[19] Woods has provided no argument for why we should allow an offensive use of the doctrine by him as a nonsignatory plaintiff. Even though Rieder and Rapee are interested parties in the Wisconsin suit and we assume for our purposes that they both authorized Cadbury to bring that suit, they themselves have asserted no claims to enforce the CQ Agreement individually here or in Wisconsin, and they are not signatories of the agreement. And while Woods's claims against Cadbury are claims against a signatory to the CQ Agreement and Cadbury has sued Woods and Meeker in Wisconsin, Cadbury has not

---

[19]In one case cited by Woods, *All Energy Corp. v. Energetix, LLC*, 985 F. Supp. 2d 974, 988, 990 (S.D. Iowa 2012), a federal district court allowed a signatory plaintiff to enforce an agreement's forum selection clause against a nonsignatory defendant who had benefited from the agreement, but the court did so applying Delaware law on closely related parties. As noted, Woods has cited no Texas case in which a court upheld the offensive use of the doctrine by a nonsignatory plaintiff to enforce a forum selection clause.

26

sued Woods or Meeker in *this* suit, and it asserts no claim in this forum that seeks to enforce the CQ Agreement or depends on that agreement's existence.[20] *Cf. G.T. Leach Builders*, 458 S.W.3d at 527.

Woods has not persuaded us that the trial court abused its discretion in overruling his estoppel arguments, *see Carlile*, 2014 WL 3891658, at *9 (noting that "estoppel is an equitable theory that may or may not be applied at the trial court's discretion"), and we therefore overrule his fourth issue. We sustain the part of Defendants' first and second issues arguing that the forum selection clause applies only to claims asserted against Cadbury by CQuentia arising from the CQ Agreement, but we overrule their argument that no such claim has been made and hold that Meeker's second declaratory judgment claim was brought against Cadbury on behalf of CQuentia and therefore falls within the scope of the forum selection clause.

## IV. Minimum Contacts and Traditional Personal Jurisdiction Issues

We now turn to the parties' traditional personal jurisdiction arguments. In Woods's fifth issue, he argues that the trial court has personal jurisdiction over Defendants and the trial court erred in granting their special appearance as to his claims because, through the CQ Agreement, they sought profits from a Texas entity that was to perform services in Texas. With this issue, we also address the remainder of

---

[20]Our analysis does not turn on the timing of Woods's lawsuit, but we point out that Woods sued Defendants here before Cadbury sued him in Wisconsin, and he therefore cannot argue that he filed suit here only in response to the Wisconsin suit.

Defendants' first and second issues challenging the trial court's ruling that it had personal jurisdiction over them for Intervenors' claims. "Whether a court has personal jurisdiction over a defendant is determined as a matter of law, which appellate courts review de novo." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010). We conclude that the trial court does not have personal jurisdiction over Defendants for either Woods's claims or Intervenors' claims[21]

## A.    Jurisdictional Requirements and Minimum Contacts

A Texas court may exercise personal jurisdiction over a nonresident defendant when doing so is permitted by the Texas long-arm statute and is consistent with federal and state due-process guarantees. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016). Under the long-arm statute, a nonresident is present in Texas for purposes of personal jurisdiction when the nonresident "does business in this state." Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *Kerlin v. Sauceda*, 263 S.W.3d 920, 927 (Tex. 2008). The long-arm statute lists certain acts that constitute "doing business," including "(1) contract[ing] by mail or otherwise with a Texas resident" when "either party is to perform the contract in whole or in part in this state" and "(2) commit[ting] a tort in whole or in part in this state." Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1), (2).

---

[21]Having already held that the forum selection clause applies to Meeker's second declaratory judgment claim against Cadbury, our traditional minimum contacts analysis does not include that claim.

But "[c]onsistent with federal due process protections," even if the long-arm statute permits exercising jurisdiction over a nonresident defendant, a state court may not exercise that jurisdiction unless "(1) the defendant has established 'minimum contacts' with the state and (2) the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *TV Azteca*, 490 S.W.3d at 36 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). "The minimum-contacts requirement protects due-process rights by permitting a state to exercise jurisdiction over a nonresident defendant only when the defendant 'could reasonably anticipate being haled into court there.'" *Id.* at 37 (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013)). Minimum contacts may give rise to either general or specific personal jurisdiction. *Id.* at 36. Because Woods and Intervenors alleged and argued only specific jurisdiction, we consider only specific jurisdiction in our analysis. A nonresident defendant's contacts with the forum state support specific jurisdiction when the contacts are purposeful and the plaintiff's cause of action arises from or relates to those contacts. *Id.*; *see also Moncrief Oil*, 414 S.W.3d at 150 (stating that for a nonresident's contacts to support specific jurisdiction, the contacts must have a substantial connection to the litigation's operative facts).

## B.    Purposeful Availment

"A defendant establishes minimum contacts with a state when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d

29

653, 657–58 (Tex. 2010) (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). In considering purposeful availment, we apply three principles:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." Finally, the "defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction." In contrast, a defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there.

*Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (citations omitted) (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)); *see also TV Azteca*, 490 S.W.3d at 38 (stating that the defendant's contacts must result from the defendant's own efforts to avail itself of the forum). "In conducting this analysis, we assess 'the quality and nature of the contacts, not the quantity.'" *TV Azteca*, 490 S.W.3d at 38 (quoting *Moncrief Oil*, 414 S.W.3d at 151).

## C. Shifting Burdens

The plaintiff has the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of the long-arm statute, and the nonresident defendant then has the burden of negating those alleged bases of jurisdiction. *Moncrief Oil*, 414 S.W.3d at 150; *see also Am. Finasco, Inc. v. Thrash*, No. 09-15-00195-CV, 2017 WL 391377, at *3 (Tex. App.—Beaumont Jan. 26, 2017, no pet.) (mem. op.) (stating

30

that once the plaintiff alleges facts sufficient to meet its burden to show the defendant is subject to the long-arm statute, the defendant must file verified pleadings negating the plaintiff's factual allegations that would otherwise show jurisdiction).

The nonresident defendant can negate jurisdiction on a legal or factual basis. *Kelly*, 301 S.W.3d at 659. The defendant negates jurisdiction factually by presenting evidence that it has no contacts with Texas, after which the plaintiff may respond with evidence to affirm its jurisdictional allegations. *Id.* The defendant negates jurisdiction legally by showing that even if the plaintiff's allegations are true, "the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; . . . that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

## D. Analysis

Woods and Intervenors acknowledged in their live pleadings that Defendants are not Texas residents, and no party disputes that, as asserted in Defendants' special appearance, Rieder and Rapee were not physically present in Texas for any of the alleged acts relevant to this litigation. The disputed questions are whether acts that Rieder and Rapee allegedly took while physically outside of Texas show purposeful availment and whether the claims asserted against them arise from those out-of-state acts. Each of the plaintiffs relies, in one way or another, on the CQ Agreement, its execution, or its

31

performance to show minimum contacts, and in each case, the alleged Texas contacts are insufficient to support personal jurisdiction over Defendants for the claims asserted.

## 1. Insufficient Minimum Contacts for Meeker's Intervention Claim Against Defendants Related to the Cadbury Operating Agreement

As stated, the trial court denied Defendants' special appearance as to Intervenors' claims. Meeker's first claim as Intervenor is for a declaratory judgment concerning the Cadbury Operating Agreement. Meeker pleaded for "a declaration that he and any entity he operates has the right to utilize Woods'[s] services without incurring liability under Paragraph 12 of the Cadbury [O]perating [A]greement." Because the operative facts of that claim are unrelated to Defendants' alleged Texas contacts, the trial court does not have jurisdiction over Defendants for this claim. *See Moki Mac*, 221 S.W.3d at 585.

Meeker's plea alleged that the trial court had jurisdiction over Defendants because (1) Cadbury consented to jurisdiction in Texas by executing the CQ Agreement containing the forum selection clause and Rieder and Rapee were members of Cadbury when this consent was provided and (2) "on information and belief, Rapee and Rieder have participated in, authorized and/or directed correspondence and other contacts with the State of Texas out of which arise the causes of action stated herein." But "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* Any contacts that Defendants had with Texas based on the

32

negotiation or execution of the CQ Agreement are irrelevant to this claim relating to the Cadbury Operating Agreement because the CQ Agreement has nothing to do with the validity or construction of the Cadbury Operating Agreement. Meeker did not allege or provide evidence that Cadbury is a Texas entity, that any party to the Cadbury Operating Agreement is a Texas resident, that Rieder or Rapee negotiated or signed the agreement in Texas, or that the agreement called for them or Woods to perform their respective obligations under that agreement in Texas. And the facts that Meeker pleaded to support his claim—that Cadbury had never had a board meeting, created a budget, or maintained corporate books and records—are wholly unrelated to any acts performed or required to be performed in Texas.

With respect to the allegation that Rapee and Rieder have had "correspondence and other contacts with the State of Texas," Meeker neither alleged nor provided evidence of communications or contacts by Defendants with Texas that have relevance to whether the Cadbury Operating Agreement is valid or whether its terms limit Woods's employment options. *See TV Azteca*, 490 S.W.3d at 52–53 (determining whether there is a substantial connection between a nonresident's contacts and the operative facts of the litigation involves consideration of what the claim is *principally* concerned with, whether the contacts will be the focus of the trial and consume most if not all of the litigation's attention, and whether the contacts are related to the operative facts of the claim).

Because Defendants do not have minimum contacts with Texas for purposes of Meeker's claim that he has the right to use Woods's services without liability, we sustain Defendants' second issue as to that claim.[22]

### 2. Insufficient Minimum Contacts for Meeker's Declaratory Judgment Claim against Rieder and Rapee Regarding the CQ Agreement

Meeker's claim on behalf of CQuentia requested a declaration that he had the right as CQuentia's manager to terminate the CQ Agreement under paragraph 5(c) of that agreement. We have already held that Cadbury has conceded jurisdiction in Texas for this claim. But Rieder and Rapee are not parties to the CQ Agreement, and there is no allegation or evidence that they have the right to enforce it or contest its termination.

---

[22]Intervenors argue that Defendants did not argue below that Texas lacks jurisdiction over Cadbury for this claim and acknowledged that the trial court had jurisdiction over Cadbury for both of Meeker's claims. We disagree. While Defendants' attorney stated generally at a hearing that there was no dispute that the trial court had jurisdiction over Cadbury "to the extent it relates to the [I]ntervenors' claims," Defendants' supplemental special appearance clarified their position that the trial court did not have jurisdiction over Cadbury for Meeker's first declaratory judgment claim under the CQ Agreement's forum selection clause because CQuentia had not asserted any claims against it, that they objected to personal jurisdiction as to both Intervenors' claims, and that their arguments in their amended special appearance applied equally to Intervenors' claims. And Defendants' brief in support asserted that the trial court had a "clear lack of jurisdiction over Defendants" as to Intervenors' claims and that their amended special appearance challenging jurisdiction over Cadbury with respect to Woods's claims also applied to Meeker's claim challenging the Cadbury Operating Agreement, which they argued was identical to Woods's claim. We consider these filings to argue that while Defendants did not dispute that the trial court had jurisdiction over Cadbury for claims by CQuentia, or at least for any claims related to the CQ Agreement, they did dispute that any such claim had been asserted or, if it had, that the trial court had jurisdiction over Cadbury for Meeker's first declaratory judgment claim.

34

*See First Bank*, 519 S.W.3d at 102. Assuming, however, that Meeker pleaded this claim against Rieder and Rapee as well, the focus of this claim will be the terms of the CQ Agreement and the grounds for which it authorized termination. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (allowing a person interested under a contract to have a court determine questions of the contract's construction); *Great Am. Ins. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) ("The goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used.").

To the extent that Meeker is seeking a declaration that the specific basis on which he terminated the CQ Agreement was authorized by the agreement's terms, the basis for terminating the agreement will likely be an issue at trial.[23] In Meeker's termination letter, his stated reason for termination was "discord among the members of Cadbury" that "may threaten the ability of [Cadbury] to perform its obligations under the [CQ Agreement] and adequately address the needs of" the agreement's clients. But even if we assume that Meeker's reason for terminating will be an operative fact of his declaratory judgment claim, there is no allegation or evidence that any of this discord involved acts of Rieder or Rapee performed or required to be performed in Texas.

---

[23]In correspondence between Cadbury and CQuentia in the record, the parties disputed whether Meeker could terminate the agreement for any reason at all or only for reasons specified in an amendment to the CQ Agreement that CQuentia claimed was never validly executed by Cadbury.

In Meeker's plea in intervention, he did not specifically state his basis for ending the CQ Agreement, but he alleged elsewhere in the pleading that Rieder and Rapee had failed to bring any clients to the business and "to provide several of their promised advantages to Cadbury" and that Cadbury had failed to have a board meeting, create a budget, or maintain corporate books and records. There is no allegation or evidence that any of these acts were performed in Texas or required to be performed here. For purposes of this claim, Rieder's and Rapee's alleged failure to bring in clients has only an indirect connection to Texas to the extent that they were supposed to bring in clients to perform their obligations to Cadbury so that Cadbury could in turn earn revenue under the CQ Agreement. Even were we to consider their performance of Cadbury's contractual obligations as their individual acts rather than Cadbury's acts, there is no allegation or evidence that they were supposed to perform or that they did perform any of that work in Texas or target Texas clients. And regardless of whether we attribute those contacts to Cadbury or to Rieder and Rapee, any contacts they had with Texas through their work for Cadbury are too inconsequential to constitute minimum contacts.

Even assuming that what prompted Meeker to bring this claim was the letter from Cadbury's attorney asserting that the CQ Agreement had not been properly terminated and threatening litigation if CQuentia did not honor its obligations, this contact does not support jurisdiction over Rieder and Rapee. Although the letter stated that the attorney represented all three defendants and that any communications with

36

the three should be directed to him, the letter's assertions about the agreement's continuation were made on behalf of Cadbury regarding Cadbury's expectation that CQuentia would honor its obligations under the CQ Agreement. Rieder and Rapee were mentioned only when the letter stated that all three of Cadbury's members owed Cadbury fiduciary duties. And, more importantly, the attorney's letter will not be the focus of the litigation over this claim because the letter is unnecessary to establish the terms of the CQ Agreement or Meeker's basis for terminating it. In summary, Meeker did not allege or provide evidence of sufficient connection between any contacts that Rieder and Rapee have with Texas and the operative facts of this particular claim. *See TV Azteca*, 490 S.W.3d at 52–53. We sustain Defendants' second issue as to CQuentia's right to terminate the CQ Agreement.

### 3. Insufficient Minimum Contacts for CQuentia's Claims

CQuentia's claims against Rieder and Rapee involve the execution of both the CQ Agreement and the subsequent M3 Agreement. Its claims for fraud and fraudulent inducement are based on the allegation that, in order to induce CQuentia to sign both agreements, Rieder and Rapee made misrepresentations about the "nature and number of their high-level contacts with several entities operating in the medical field, the number and quality of their available sales representatives, and the work that they would perform to obtain clients under" those agreements. CQuentia based its negligent misrepresentation claim on these same representations, asserting that Rieder and Rapee made these representations "in the course of CQuentia's business" in order to "guide"

37

CQuentia to entering into the CQ Agreement and the M3 Agreement. As we explain, Rieder's and Rapee's limited contacts with Texas residents through emails, telephone calls, and videoconferences are insufficient to support minimum contacts.

### a. Vague Jurisdictional Allegations

We begin by looking at CQuentia's jurisdictional allegations. CQuentia's plea in intervention alleged that the trial court has subject matter jurisdiction because "th[ese] cause[s] of action arose in part in Texas," that venue was proper in Tarrant County "because a substantial part of the causes of action occurred [t]here," and that the trial court had jurisdiction over Rieder and Rapee because they "have participated in, authorized and/or directed correspondence and oral representations with the State of Texas out of which arise the causes of action stated herein."[24] CQuentia does not provide any factual elaboration on what it means by saying that Rieder and Rapee participated in or directed communications "with the State of Texas" and does not actually allege that any of the alleged communications occurred while Rieder and Rapee were physically present in Texas.[25] *See City of White Settlement v. Emmons*, No. 02-17-

---

[24]The plea in intervention also asserted jurisdiction over Rieder and Rapee based on the forum selection clause, but the Texas Supreme Court and now this court have overruled the plaintiffs' arguments that the forum selection clause applies to Rieder and Rapee.

[25]This phrasing may have been intended to invoke the "directing a tort" jurisdictional analysis. If so, the pleading does not provide any factual allegations to support an argument that Rieder and Rapee targeted Texas, as opposed to targeting CQuentia. *See TV Azteca*, 490 S.W.3d at 43 (pointing out the "subtle yet crucial difference between directing a tort at an individual who happens to live in a particular

00358-CV, 2018 WL 4625823, at \*14 (Tex. App.—Fort Worth Sept. 27, 2018, pet. denied) (mem. op.) ("A nonresident who, *while physically present* in the State of Texas, makes statements alleged to be fraudulent is subject to specific jurisdiction in Texas in a subsequent action arising from the statement." (emphasis added)).

Other parts of the pleading, however, include the assertion that Rieder and Rapee made representations to CQuentia. No specific CQuentia representative is identified as the recipient of these representations, but because the plea discusses Woods's introducing Rieder and Rapee to Meeker, the implication is that the representations were made to Meeker. But, again, there is no allegation of where these representations were made or sent, and thus there is no indication of whether CQuentia's allegation that the communications were directed "at Texas" is based on the communications being sent to and received in Texas, based on only the fact that the communications were made to a Texas resident, or based on something else. *See Hanor*, 2020 WL 7364659, at \*4 ("For the exercise of personal jurisdiction to comport with due process, 'the plaintiff cannot be the only link between the defendant and the forum.'" (quoting *Walden v. Fiore*, 571 U.S. 277, 285, 134 S. Ct. 1115, 1122 (2014))). Assuming, however,

_____

state and directing a tort at that state" and stating that "the fact that the plaintiff lives and was injured in the forum state is not irrelevant to the jurisdictional inquiry, but it is relevant only to the extent that it shows that *the forum state*" was the focus of the defendant's activities); *see also Hanor v. Hanor*, No. 04-20-00142-CV, 2020 WL 7364659, at \*3 (Tex. App.—San Antonio Dec. 16, 2020, no pet. ) (mem. op.) ("We consider only the defendant's contacts with Texas itself, not his contacts with persons who live in Texas.").

that CQuentia's vague allegation that "part of the causes of action" occurred in Texas is sufficient to satisfy Texas's long-arm statute, asserting personal jurisdiction over Rieder and Rapee for these claims does not satisfy due process because the alleged contacts do not show purposeful availment and are not sufficiently connected to the operative facts of CQuentia's claims. *See Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 68–69 (Tex. 2016) (stating that specific jurisdiction does not turn on where a plaintiff happens to be and that it is not enough for specific jurisdiction that the defendant knew that the alleged harm would be felt in the forum state).

### b. Insufficient Jurisdictional Evidence

Looking at the jurisdictional evidence provided by Intervenors, we have the following contacts asserted by CQuentia as supporting jurisdiction. CQuentia is a Texas entity, and CQuentia alleged that Rieder and Rapee made misrepresentations to its representatives and that CQuentia contracted with Cadbury in reliance on those representations. *See Michiana*, 168 S.W.3d at 787 (observing that in some circumstances a single contract, such as one that involves many contacts over a long period of time, may meet the purposeful-availment standard); *Cent. Petroleum Ltd. v. Geoscience Res. Recovery, LLC*, 543 S.W.3d 901, 921 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (op. on reh'g) (stating that the operative facts of a fraudulent misrepresentation claim include defendant's making of the misrepresentation and the plaintiff's reliance on the misrepresentation). And, in performing under the CQ Agreement, CQuentia sent two checks to Cadbury—one for just under $3,000 and one for $115.49—for

40

Cadbury's share of the revenue generated by its marketing, funds that would presumably indirectly benefit Cadbury's members. Further, Rieder and Rapee exchanged many emails with Texas employees of CQuentia. *But see Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 564 (Tex. 2018) (stating that accepting money drawn on a Texas bank is of negligible significance for purposes of determining whether a nonresident has sufficient contacts with Texas); *Michiana*, 168 S.W.3d at 788 (stating that "'financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State'" (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299, 100 S. Ct. 559, 568 (1980)). And the CQ Agreement had a forum selection clause designating Texas as the forum for any disputes among the parties arising from that contract. *Michiana*, 168 S.W.3d at 792 ("[C]hoice-of-law provisions should not be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws.'").

On the other hand, CQuentia has not disputed Rieder and Rapee's assertions in their special appearance that they have not been physically present in Texas for any purpose or act related to the claims against them in this suit, and there is no allegation or evidence that Rieder and Rapee made any representations while physically in Texas.[26]

---

[26] Cadbury's Wisconsin complaint identifies California and Wisconsin as the location of in-person meetings among the parties that led to the CQ Agreement. *But see OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *8 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.) (pleadings are not evidence).

CQuentia's plea in intervention did not specify the form of the correspondence that Rieder and Rapee had with CQuentia, and the only evidence on that point is the affidavits of Meeker and CQuentia president Stephen Mallick in which they averred that the representations were made in phone calls[27] and videoconferences.[28]  These types of communications do not, without more, establish personal jurisdiction based on a tort committed in Texas or a tort directed at Texas.  *See Hatzenbuehler v. Essig*, 526 S.W.3d 657, 665 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (op. on reh'g).  And while Meeker averred that Rieder and Rapee were told that CQuentia is a Texas-based entity, their knowledge of CQuentia's headquarter's location does not move the location of their representations to Texas.  While "'[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state,'" *Retamco Operating*, 278 S.W.3d at 339 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 2184 (1985)), we are unpersuaded that in the context in which they were made, the

---

Whether the meetings were held in Wisconsin or elsewhere, what matters for our analysis is that no party or evidence disputes that no in-person meetings occurred in Texas.  Thus, for jurisdiction to exist, it must be based on some other contact by Rieder and Rapee with the forum.

[27]Rieder and Rapee do not dispute that they exchanged phone calls with Meeker about the formation of the CQ Agreement, but they do not concede that they made any misrepresentations in those communications.

[28]To the extent that mailed correspondence can show commission of a tort in the forum state, CQuentia did not allege or provide evidence that the representations were made in letters mailed to Texas.

42

telephone conversations and videoconferences, without more, are sufficient to support jurisdiction over Rieder and Rapee for CQuentia's claims. *See Star Motors, LLC v. Motorwerks Vehicle Sales LLC*, No. 14-18-00763-CV, 2019 WL 2385755, at *3 (Tex. App.—Houston [14th Dist.] June 6, 2019, pet. denied) (mem. op.) (citing cases of appellate courts rejecting as insufficient to prove purposeful availment allegations of tortious conduct occurring during telephone calls or in emails to a resident of the forum state).

Further, CQuentia's own evidence indicates that the idea of the business partnership came from Meeker or Woods, not Rieder and Rapee.[29] *Contra Lucas v. Ryan*, No. 02-18-00053-CV, 2019 WL 2635561, at *9 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) ("Lucas and Invenias specifically chose to use, and initiated contact with, a Texas resident for her skill and expertise."). Meeker acknowledged that Rieder and Rapee did not approach CQuentia to solicit its business. His affidavit states that he and Woods discussed doing business together, and Woods then introduced Meeker to Rieder and Rapee. CQuentia and Meeker's response to the special appearance

---

[29]We do not hold that conversations about doing business in Texas never support personal jurisdiction over a nonresident defendant if the Texas resident approached the defendant to do business rather than the other way around. Whether the nonresident defendant approached the Texas resident first is merely a factor to consider in determining whether the defendant has sufficient contacts with Texas. *See, e.g.*, *Raiden Commodities, LP v. De Man*, No. 01-17-00181-CV, 2018 WL 3151004, at *4 & n.3 (Tex. App.—Houston [1st Dist.] June 28, 2018, no pet.) (mem. op.) (examining the defendant's contacts in a case in which the plaintiff, then a Texas resident, approached the nonresident defendant about employment with the plaintiff's companies).

attached as jurisdictional evidence an email from Rieder to a potential series partner in which Rieder explained how he and Rapee became involved with Meeker. This email supported the statement in Meeker's affidavit that it was Woods who brought Meeker to them and that the idea of selling CQuentia's services did not come from Rieder or Rapee. The email explained that Woods owns a finance company and had previously done work for Meeker, and Meeker contacted Woods about a business partner's financing the purchase of a Wisconsin pharmacy. Rieder and Rapee had hired Woods as a consultant for Care Integrations, and in a conversation between Meeker and Woods, "[Meeker] introduced [Woods] to PGx, and [Woods] discussed how [Rieder and Rapee] were distributing/educating [their] clients on telemedicine, and [Meeker] offered [them] the option to distribute PGx and RRP testing." Other evidence shows that before Woods brought the idea to them, Rieder and Rapee were engaged together in an entirely different line of business—telemedicine services—and there is no evidence that they had plans to work with or solicit CQuentia or any other Texas entity.

Further, with respect to the CQ Agreement as a Texas contact, as the Texas Supreme Court has already pointed out, Rieder and Rapee are not parties to that contract and did not agree to be bound by it, *Rieder*, 603 S.W.3d at 101; *cf. Burger King*, 471 U.S. at 482, 105 S. Ct. at 2187 (choice of law provision, standing alone, is insufficient to confer jurisdiction). They would not have foreseen that the forum selection clause would be enforced against them and that they would be haled into court in Texas under the agreement. *See Rieder*, 603 S.W.3d at 101; *see also Volkswagen*, 444

44

U.S. at 297, 100 S. Ct. at 567 ("[T]he foreseeability that is critical to due process analysis is . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.").

The bulk of Intervenors' jurisdictional evidence consisted of hundreds of pages of email correspondence, primarily involving Rieder, Rapee, Woods, and Meeker. These emails have only a loose connection to CQuentia's claims and do not show a sufficient connection to Texas. In these communications, Rapee (and to a lesser extent, Rieder) sent emails to and responded to emails from Meeker, Woods, and others, setting up meetings for clients and potential clients and then following up with each other after those meetings. These emails do not show any representations by Rieder and Rapee about their contacts in the medical field or their ability to supply a salesforce.[30] And to the extent that they relate to Rieder's and Rapee's promises about working under the CQ Agreement and the M3 Agreement, they show Rieder and Rapee performing that work, setting up meetings with potential clients. CQuentia does not allege that these emails themselves show Rieder and Rapee making the alleged representations that induced it to sign an agreement with Cadbury, and our review of the record did not

---

[30]We do not need to address whether and in what context extensive exchanging of emails can constitute minimum contacts for a claim because the record here does not show that any emails contained the alleged misrepresentations, and Meeker's and Mallick's affidavits say the alleged misrepresentations were made in telephone calls and videoconferences.

45

reveal emails in which the alleged representations were made.[31] Thus, even though some of the emails were to or from CQuentia personnel, they do not show contacts with Texas that will be the focus of litigating these claims.

In some of these emails, Rapee communicated with CQuentia employees about providing CQuentia forms and educational materials to clients, and Meeker and Mallick referenced these emails in their affidavits in order to demonstrate contacts with Texas. For example, Rapee emailed a potential client in Wisconsin, attaching documents for the client's review and confirming an upcoming "lunch and learn" in Wisconsin. In that email, he copied CQuentia employee Courtney Kramer and informed the client, "[Kramer] will call you to go over the attached account set up form so when we meet . . . you are an established account." Kramer responded, identifying herself to the potential client as "one of the liasons [sic] between CQuentia and [the client] to help implement and manage PGx testing in [the client's] facilities." Rapee later emailed Kramer and asked if he could call her during the upcoming meeting with that client "to answer any questions [he] might not have covered." In another exchange, Rapee emailed Kevin Jones, CQuentia's chief operating officer, about whether CQuentia had testing for certain health conditions. And Mallick asserted in an affidavit that Rieder

_____

[31]Again, Meeker's affidavit identifies phone calls and videoconferences, not these emails, as the communication medium for the representations made to CQuentia.

46

and Rapee "often contacted" Kramer and another account representative through calls and emails "to request assistance from CQuentia."

But assuming that Rieder and Rapee's performance of *Cadbury's* contractual obligations could create a sufficient relationship between *them* and Texas for purposes of CQuentia's misrepresentation claims, the evidence of their performance here—their emails, telephone calls, and videoconferences with CQuentia employees—does not. For the purposes of those communications, the CQuentia employees involved in those long-distance emails, telephone calls, and videoconferences "could, quite literally, have been based anywhere in the world," and Rieder and Rapee would presumably have interacted with CQuentia and its employees in the same way as they did here.[32] *See Searcy*, 496 S.W.3d at 74–75; *see also Hatzenbuehler*, 526 S.W.3d at 665 (stating that telephone calls and emails, without more, are an insufficient basis for establishing personal jurisdiction based on a tort committed in the state); *Furtek & Assocs., L.L.C. v. Maxus Healthcare Partners, LLC*, No. 02-15-00309-CV, 2016 WL 1600850, at *5 (Tex. App.—Fort Worth Apr. 21, 2016, no pet.) (mem. op.) (stating same and pointing out that "[t]he rationale . . . is that jurisdiction should not be determined by the fortuitous location of the Texas resident when the nonresident defendant communicates with them"). Thus, they do not constitute purposeful contacts with Texas, even were we to

---

[32]The CQ Agreement called for CQuentia to perform certain lab services, but it specified that CQuentia would maintain a molecular diagnostic lab in Tennessee for that purpose.

consider them to be substantially connected to CQuentia's misrepresentation claims. And there is no allegation or evidence that these contacts with employees contained the representations relied on by CQuentia. *See TV Azteca*, 490 S.W.3d at 52–53. These contacts are too inconsequential to constitute minimum contacts for these claims.

Intervenors further pointed to two connections to Texas through their relationship with CQuentia, but neither shows a substantial connection between Texas and Rieder and Rapee. First, the record contains evidence showing that through Cadbury—or more particularly, through Woods—CQuentia developed a relationship with Alliance Medical, an Austin, Texas entity, to provide sales representatives "covering most major cities."[33] An email chain shows that not long after forming this relationship, Woods emailed both Rapee and Gary Brown, Alliance's president, to tell Rapee, "Gary at Alliance has a V[eteran's] A[dministration] contract that we can add too. It may be useful for your VA contact. It may make sense for you two to speak." Rapee responded with his cell phone number, and the two arranged a phone call later that day. Another email makes clear that the phone conversation took place and that in that call, the two discussed Alliance's VA contract. There is no allegation or evidence

---

[33]Emails in the record indicate that it was Woods who met with and solicited Alliance. But Cadbury's Wisconsin complaint states that "Rieder, Rapee, and Woods . . . developed a marketing and training program for sales representatives" with Alliance, indicating that after the relationship with Alliance was formed, Rieder and Rapee participated in training Alliance's sales representatives—or at least that Cadbury is willing to claim that they did. *But see OZO Capital*, 2018 WL 1531444, at *8 (noting that pleadings generally are not evidence, even when verified).

that Rapee met with Brown or any other Alliance representative in Texas or that Rieder and Rapee purposefully targeted Alliance, only that Rapee became involved with Alliance at the behest of Woods. And there is no indication that Rapee's communications with Brown and Alliance, which were made in performance of Cadbury's obligations under the CQ Agreement, would be the focus of CQuentia's effort to establish that Rieder and Rapee made misrepresentations upon which CQuentia relied. *See TV Azteca*, 490 S.W.3d at 52–53.

CQuentia also relied on an email that Rapee sent to Mallick and others seeking to set up a web meeting with Rapee's contact with the Veteran's Administration. Mallick stated in his affidavit that "Rieder and Rapee's efforts to sell CQuentia's PGx services to Veteran Administration facilities included facilities located in Texas." But there is no indication that Rieder and Rapee were specifically targeting the VA's Texas facilities (as opposed to targeting the VA generally) and no allegation or evidence that Rieder or Rapee made any representations about their ability to target VA facilities in Texas in order to induce the execution of the CQ Agreement and the M3 Agreement.

Because Rieder and Rapee do not have minimum contacts with Texas for purposes of CQuentia's claims, we sustain Defendants' first issue.

### 4. Insufficient Minimum Contacts for Woods's Claims

The trial court did grant Defendants' special appearance directed at Woods's claims. Woods argues in his fifth issue that the trial court has jurisdiction over Defendants for his claims because of their solicitation of CQuentia "for business and

profits" and because of CQuentia's partial performance of that business in Texas.[34]  We

disagree.  Woods's claims are all disputes among an out-of-state entity and its

nonresident members and have only a tenuous, insubstantial connection to Texas.

### a.    Declaratory Judgment Claims

Woods sought two declarations from the trial court.  First, he requested a

declaration as to "the legal relations between himself on the one hand and Rieder,

Rapee, and Cadbury on the other" and "any obligations [he] may have to Cadbury,

which entity . . . never became legally efficacious."  More specifically, he wanted a

declaration that "the restrictive covenant of the [Cadbury] Operating Agreement never

became effective."[35]  Second, he requested a declaration that, even if Cadbury is a viable

entity, "it in fact never entered into any legally enforceable contract with CQ[uentia]

because any such relationship was never undertaken by or ratified by the Board."

Regarding the first declaratory judgment claim, Woods did not allege that the

Cadbury Operating Agreement had a Texas resident as a party or called for performance

---

[34]We previously held that all of Woods's claims were intertwined with the CQ Agreement, but we did so based on our conclusion that the CQ Agreement and the Cadbury Operating Agreement were part of the same business transaction and that we should read the two contracts together to understand the parties' agreement.  *Rieder*, 587 S.W.3d at 46, 47–48.  The Texas Supreme Court rejected these conclusions.  *Rieder*, 603 S.W.3d at 102.

[35]Meeker's first declaratory judgment claim requested essentially the same relief—a declaration that "he and any entity he operates has the right to utilize Woods'[s] services without incurring liability under Paragraph 12 of the Cadbury [O]perating [A]greement" on the basis that Cadbury had never begun operations.

in Texas, and the agreement's terms show that it did not. Cadbury is undisputedly not a Texas entity. As with Meeker's related claim, there is no allegation or evidence that any part of the Cadbury Operating Agreement was negotiated in Texas or that it was signed in Texas. Woods's claim that Cadbury never became operational is based on allegation that its members never performed certain acts called for by its operating agreement—selecting board members, holding board meetings and conducting other official business, distributing a balance sheet, preparing a budget, and creating books and records—and there is no allegation or evidence that any of these acts were performed or were required to be performed in Texas. In short, with respect to the operative facts of this claim, the Defendants have no connection at all to Texas. *See Moncrief Oil*, 414 S.W.3d at 150 (stating that specific jurisdiction requires that the nonresident's forum contacts have a substantial connection to the litigation's operative facts).

Woods argued in a supplemental response to Defendants' amended special appearance that "the 'genesis' of that claim is whether Woods is precluded by the Operating Agreement for Cadbury *from continuing to deal with Meeker and CQuentia*, as he did before Cadbury was 'formed.'" [Emphasis in original.] But while Woods's desired outcome is that he be allowed to do business with Meeker without any restrictions from the Cadbury Operating Agreement, that desire does not connect any of the operative facts of his claim to any contact by Defendants with Texas, and his motivation in filing suit is not an operative fact of his claim. Instead, the focus of litigating the claim will

51

be on the terms of the Cadbury Operating Agreement and the acts or omissions of its nonresident members in operating the out-of-state entity.

Likewise, Woods's claim for a declaration regarding whether Cadbury's board ratified the CQ Agreement is not sufficiently connected to Texas for the trial court to have jurisdiction over it. We do not ignore the facts that the CQ Agreement is an agreement with a Texas entity and contains a Texas choice-of-law provision, that Cadbury received some revenue checks under the agreement, and that Woods alleged that Rieder took "several thousand dollars from money Woods brought in from CQ[uentia]." But Woods's claim is not substantially connected to these alleged contacts. Woods's allegation is that the Cadbury Operating Agreement prohibited one member (in this case, Woods) from binding the company unless authorized in writing to do so by the board and that the board never ratified the CQ Agreement that Woods executed on Cadbury's behalf. Woods's claim turns on whether the members of a non-Texas entity, none of whom are Texas residents, performed acts called for by the entity's operating agreement.

Woods also argues that this claim is based on Defendants' Texas contacts because he is suing to have the CQ Agreement declared invalid, and the CQ Agreement is a contact between Defendants and Texas. But his claim has nothing to do with the terms of the CQ Agreement, its negotiation, its performance, or its execution by himself and Meeker on behalf of the respective entities. The connection between this claim

52

and Texas contacts is too tenuous to support personal jurisdiction over Defendants. We overrule this part of Woods's fifth issue.

### b. Breach of Contract

For his breach of contract claim, Woods alleged that Rieder and Rapee "made offers to Woods as to bringing in business and a sales force if Woods would enter into [Cadbury] with them," that he accepted that offer and joined Cadbury, and that Rieder and Rapee breached that agreement by not bringing in business and a sales force. Woods claimed unspecified damages resulting from that breach, and, in the alternative, he sought a declaration that the breach "free[d] up Woods" from the Cadbury Operating Agreement's restrictive covenants.[36]

Again, Woods does not contend that the Cadbury Operating Agreement was signed in Texas or by Texas residents, that it called for performance in Texas by any of its parties, that it was negotiated in Texas, that it targeted Texas residents, or that it was breached in Texas. *See, e.g.*, *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007) (considering fact that contract was not negotiated in Texas in determining whether the contract gave rise to personal jurisdiction). There is no evidence that Woods, Rieder,

---

[36]Woods's petition asserts that he should be released from his obligations under the Cadbury Operating Agreement because of Rieder and Rapee's "prior material breaches" of their "CQ obligations" to bring in business and a sales force for CQuentia, which we read as asserting that Rieder and Rapee had those obligations under the terms of the Cadbury Operating Agreement. But as the Texas Supreme Court has stated, "[n]oticeably absent from the Cadbury [Operating] Agreement is any mention of CQuentia or the [CQ] Agreement." *Rieder*, 603 S.W.3d at 95.

and Rapee were the named parties to *any* contract that was signed or negotiated in Texas, included a Texas resident as a party, called for a party's performance in Texas, or was breached in Texas.[37]

The operative facts of Woods's breach of contract claim do not involve Texas contacts by Defendants. We overrule Woods's fifth issue as to this claim.

### c.     Fraud Claim

Woods asserted his fraud claim based on the following alleged misrepresentations by Rieder and Rapee:

> Rieder represented to Woods that he had multiple hospitals where he practiced and had high level contacts, and he assured Woods that he would bring this business to the new entity (which eventuated in Cadbury), and that Rieder would roll out services to his clients. . . . Rieder further assured Woods that Cadbury could and would replicate Rieder's sleep products and that Rieder would make this happen. . . . Rieder also represented he would . . . use his background to write white papers and speak on the topic of PGx testing . . . . For his part, Rapee assured Woods that his own company would have 20 other sales representatives selling products for Cadbury . . . . Rapee represented that he would travel and help train the sales force, but did not.
>
>         . . . .

---

[37]Woods cites to *Barnhill v. Automated Shrimp Corp.*, 222 S.W.3d 756, 764 (Tex. App.—Waco 2007, no pet.), to argue that entering into a contract that "contemplates a long-term relationship with Texas" can give rise to specific jurisdiction. *Barnhill* is distinguishable because, among other things, in that case the nonresident defendant not only contracted with a Texas entity in his individual capacity, he also received shares of stock in a Texas corporation—Texas assets—for which he served as chairperson and CEO. *Id.* at 764–66. The Cadbury Operating Agreement does not involve Texas partners or assets.

. . . Based on the representations of Rieder and Rapee as aforesaid, Woods agreed with Rieder and Rapee to undertake to create a Nevada limited liability company, Cadbury, and then signed off on the [Cadbury Operating Agreement].

Woods alleged that he "reasonably relied on those false representations and promises by agreeing to form Cadbury and provide efforts to obtain business for Cadbury, including with CQ[uentia]."

Woods did not allege, and no evidence showed, that Rieder and Rapee made these representations while physically present in Texas or even that Woods relied on any representations made in Texas. *See Booth v. Kontomitras*, 485 S.W.3d 461, 486 (Tex. App.—Beaumont 2016, no pet.). Woods, the recipient of the alleged misrepresentations, is not a Texas resident. The Cadbury Operating Agreement, which allegedly resulted from the representations, does not call for performance in Texas or involve a Texas resident as a party and or Texas assets.

In Woods's amended petition and his responses to Defendants' amended special appearance, he noted that Cadbury signed the CQ Agreement with Texas-based CQuentia under which Cadbury earned revenue (some of which, according to Woods, Rieder withdrew for another one of his businesses). But even assuming that Cadbury's contracting with a Texas entity and earning revenue from the contract constitute contacts by Rieder and Rapee with Texas, these contacts do not have a substantial connection to Woods's claim that Rieder and Rapee made misrepresentations to induce

(Utah-resident) Woods to form Cadbury with them to his detriment.[38] *See TV Azteca,* 490 S.W.3d at 52–53; *Cent. Petroleum,* 543 S.W.3d at 921 (identifying the operative facts of a fraudulent misrepresentation claim as facts showing a misrepresentation that was false when made and made knowingly or recklessly, that the plaintiff relied on the false representation, and that the plaintiff was injured by that reliance); *WaterWorks Corral Creek, LLC v. AquaTech Saltwater Disposal LLC,* No. 03-16-00309-CV, 2018 WL 988907, at *7 (Tex. App.—Austin Feb. 21, 2018, pet. dism'd) (mem. op.) (quoting *Searcy,* 496 S.W.3d at 67, for the proposition that "[a] forum state has specific jurisdiction over a nonresident defendant when the defendant's purposeful activities in the forum state themselves give rise to the liabilities sued on" (internal quotations marks omitted)).

We acknowledge that the CQ Agreement has a tangential relation to the fraud claim because Woods argues that the CQ Agreement arose from his soliciting business from CQuentia (that is, from *his* contact with a Texas entity) on behalf of Cadbury, which he did only after agreeing to form Cadbury, which he would not have done

---

[38]Woods argues that because he was Cadbury's agent with respect to the CQ Agreement, his act of executing the CQ Agreement on behalf of Cadbury is a contact with Texas that may be imputed to Cadbury. Woods includes this argument in the section of his brief that sets out his transaction-participant arguments, but he cites cases discussing agency with respect to minimum contacts, so we briefly address that argument. Simply put, the agency argument makes no difference to our holding because, in our analysis, we have assumed that Woods's execution of the CQ Agreement was an act of Cadbury. That contact, however, does not support personal jurisdiction over Defendants because, for purposes of the claims against them, that contract is not substantially connected to the operative facts of the claims, does not demonstrate purposeful availment, or both.

without Rieder's and Rapee's representations.[39] While Woods asserts in his brief that he worked with Meeker and CQuentia in reliance on Rieder's and Rapee's representations, his actual argument is not that was induced to his detriment to work for Meeker and CQuentia; his expressed desire is to continue working for Meeker. Rather, his argument is that he was induced to do that work for Cadbury's benefit rather than his own direct benefit. In any case, under Woods's arguments, the CQ Agreement arose from his Texas contact, whose business he brought to a Nevada corporation based on representations made to him, a Utah resident, somewhere other than Texas about how he, Rieder, and Rapee could operate a business based outside of Texas. There is too tenuous a connection between Rieder and Rapee's contacts with Texas and Woods's claim to support jurisdiction. At the end of the day, this claim is about a dispute among three nonresidents about allegedly fraudulent representations that took place outside of Texas and concerned Rieder's and Rapee's out-of-state acts and business contacts.

---

[39]Woods's affidavit, though vague on the timing of events, is phrased to imply that he first agreed with Rieder and Rapee to form Cadbury and then had discussions with Meeker in which he sought CQuentia's business for Cadbury. However, Woods also argued in his responses to the amended special appearance that Cadbury was formed specifically to pursue the CQ Agreement and that Rapee was interacting with CQuentia at Woods's behest prior to Cadbury's formation. Defendants and Intervenors all say that Woods introduced Meeker to Rieder and Rapee before Cadbury's formation. Whatever the timing, Woods is consistent in arguing that the CQ Agreement arose from his contact (either on behalf of Cadbury or before Cadbury was formed) with a Texas entity.

Like Intervenors, Woods also cites hundreds of pages of emails showing Rieder's and Rapee's efforts to sell CQuentia's services and their communication with Meeker and other CQuentia personnel about those efforts. Woods also cites the same email relied on by Intervenors in which Rieder told a potential partner about how he became involved with CQuentia. In that email, Rieder stated that in a conversation between Woods and Meeker on an unrelated matter, "[Meeker] introduced [Woods] to PGx, and [Woods] discussed how we were distributing/educating our clients on telemedicine, and [Meeker] offered us the option to distribute PGx and RRP testing." The email went on, "I bring the clinical background and hospital credibility, [Rapee] brings network/distribution/sales team, and [Woods] brings Ops and contracting experience." In another email cited by Woods, Rieder told someone, "The money behind the lab is from D. Alan Meeker (fort worth) not the geneticist if you google him."

These emails relate to Rieder's and Rapee's attempts to sell CQuentia's services and their understanding of their relationship with CQuentia. Emphasizing the "offered *us*" language in the first email, Woods cites the email as evidence that Rieder and Rapee sought a profit through CQuentia. But none of these emails show a sufficient connection between any contacts Rieder and Rapee had with Texas and the operative facts of Woods's fraud claim; they do not show any misrepresentations by Rieder and Rapee to Woods on which he relied.[40]

---

[40]We do not ignore the fact that, based on the record before us, Rieder, Rapee, and Woods all understood that Woods would be bringing or attempting to bring

58

Woods also points to emails showing that "Rapee was interacting with CQ[uentia], at Woods'[s] behest, [and] copy[ing] Rieder, *even before Cadbury was formed*." These emails show Rapee, with Woods's encouragement, trying to arrange meetings in Wisconsin between CQuentia's Mallick and potential Wisconsin clients. At that point, Cadbury had not been formed, and there is no evidence or allegation that Rieder or Rapee had a contract with CQuentia. Although we assume that Rapee was helping set up the meetings because they would benefit him in some way, these emails do not themselves demonstrate Rieder and Rapee directly profited from a relationship with CQuentia. They show Rapee helping CQuentia attempt to get business in Wisconsin. And, more importantly, they do not show Rieder and Rapee making misrepresentations to Woods, in Texas or elsewhere.

Finally, quoting the argument of his attorney at a pretrial hearing, Woods argues that his "work[ing] with CQuentia and Mr. Meeker and also continu[ing] to work for M3" in performance of Cadbury's contractual obligations is evidence of his justifiable reliance on Rieder's and Rapee's misrepresentations and that "that's an element of fraud[,] and that happened down here in Texas." He also cites emails showing that in performing under the CQ Agreement, Woods met with Texas entity Alliance Medical

---

CQuentia's business to Cadbury. But in this particular case, that fact is not enough to show minimum contacts for purposes of Woods's claims.

and successfully solicited it to provide sales representatives for CQuentia's services.[41]

But even if these acts by Woods would be relevant in establishing Woods's claim, his

selling CQuentia's services and recruiting a Texas company are contacts by *Woods*. They

do not, without more, show contacts by Rieder and Rapee with Texas. *See Moki Mac*,

221 S.W.3d at 575 (explaining that only the defendant's contacts with the forum matter

for personal jurisdiction). The fact that Woods solicited business in Texas on behalf of

Cadbury is not enough to confer jurisdiction over Rieder and Rapee for this claim given

that there is no evidence that Rieder and Rapee made the alleged misrepresentations in

Texas, that Cadbury is a Texas entity, that Woods is a Texas resident, or that the

representations concerned performance in Texas or Texas property.[42]

We overrule Woods's fifth issue as to this claim.

### d.   Tortious Interference

Finally, Woods alleged that by threatening CQuentia with legal action if it

maintains its "business relationship and/or contractual relationship with Woods,

---

[41]As noted above, Intervenors also produced emails showing that Rapee solicited business with a contact with the VA and that the VA has some facilities in Texas, but this contact does not have a substantial connection to Woods's claim, either.

[42]Woods cites *Cornerstone Healthcare Group Holding, Inc. v. Nautic Management VI, L.P.*, 493 S.W.3d 65, 73 (Tex. 2016), to support his argument. In that case, the nonresident defendant invested in newly-created Texas subsidiaries that deliberately sought out and purchased a chain of Texas hospitals—Texas assets—from a Texas company and that were created for that purpose, and the plaintiff's claims arose from those contacts. Here, there is no allegation or evidence that Defendants sought out or obtained Texas assets.

[Defendants] are tortiously interfering with that relationship." The contacts from which this claim directly arises are the letters from Cadbury's Wisconsin attorney to Woods and CQuentia in response to the letter that Meeker sent Cadbury's three members. Woods argues that these letters constituted voluntary contacts with CQuentia, a Texas entity, and Meeker, a Texas resident. Woods also relies on the fact that the letters arose from Woods's attempt to take CQuentia's business from Cadbury. In essence, he contends that the letters interfered with his relationship with Meeker in order to protect Cadbury's relationship with CQuentia and that his claim therefore arises from Defendants' contacts with Texas—i.e., the CQ Agreement.

The attorney's letters were responding to contact by Meeker and CQuentia. On September 15, 2016, Meeker sent a letter to Woods, Rieder, and Rapee telling them that "[i]t ha[d] come to [his] attention that there is discord among the [Cadbury] members . . . [that] may threaten the ability of [Cadbury] to perform its obligations" under the CQ Agreement, and, accordingly, CQuentia was terminating the agreement. The letter went on to say that "[n]otwithstanding the foregoing, if any or all of you would be interested in continuing to work with [CQuentia] under a new arrangement, we would be interested in receiving your proposal in writing by 5 pm Central time, September 23, 2016."

Cadbury's Wisconsin attorney sent a response informing Meeker that the conditions for terminating the CQ Agreement had not been met and that Cadbury would commence legal action if CQuentia failed to honor its obligations under the

agreement. Relevant to Woods's claim, the letter also stated that none of the Cadbury members—including Woods—could submit a proposal to work with CQuentia because it would violate the Cadbury Operating Agreement and the Cadbury's members' fiduciary duties to Cadbury. The letter requested that CQuentia notify the attorney if Woods submitted a proposal in violation of his obligations to Cadbury "as legal action will be commenced." The letter further requested that CQuentia "cease and desist all further contact with Kenny Woods that would be violative of" his fiduciary duties to Cadbury.

Cadbury's attorney also sent a letter to Woods. The letter reminded Woods of his duties to Cadbury, informed him that the other members of Cadbury had learned that Woods had done or intended to do business with "an active customer of Cadbury," and directed him to cease any further unauthorized contact with CQuentia. The letter cautioned Woods that "[a]ny action undertaken by you in breach of your [fiduciary and contractual] obligations will lead to legal action being commenced."

Woods took that letter to CQuentia, and CQuentia's general counsel replied to the attorney on Woods's behalf. In the reply, CQuentia's attorney asserted that the CQ Agreement had been properly terminated and that Woods owed no fiduciary or contractual obligations to Cadbury. According to Woods's amended petition and affidavit, Cadbury's attorney responded to CQuentia with a letter reiterating that the CQ Agreement and Woods's obligations to Cadbury both remained in effect and stating that "[n]otice has been given to CQuentia not to interfere with that relationship." Based

on these letters, Woods's amended petition asserted that "[b]y now threatening CQ[uentia] with legal action if it maintains its business relationship and/or contractual relationship with Woods, Cadbury, Rieder, and Rapee are tortiously interfering with that relationship."

Woods relies on the fact that Cadbury's attorney threatened CQuentia with litigation if CQuentia did not honor the CQ Agreement and the fact that Cadbury subsequently sued Woods and Meeker in Wisconsin on claims that assumed the validity of the CQ Agreement. But Woods's claim is not based on litigation over the validity of the CQ Agreement. His claim is based on Defendants' interference with his separate relationship with Meeker and CQuentia, which he contends existed prior to and apart from the CQ Agreement, and their threats to sue him under the Cadbury Operating Agreement if Woods breached his obligations arising from that agreement. Certainly, the letters attempted to dissuade Woods and Meeker from taking business from Cadbury, and the letters have a relationship to the CQ Agreement in that it was Woods's allegedly taking CQuentia's business from Cadbury that constituted Woods's alleged breach of duties to Cadbury and thus what prompted the letters. But the letters' threats to sue CQuentia for terminating the CQ Agreement do not form the basis of Woods's claim; the threats to sue over Woods's duties to Cadbury do.

The CQ Agreement is not a contact of Rieder and Rapee for purposes of this particular claim; they are not parties to that agreement, did not sign it in any capacity, and cannot sue to enforce it in their individual capacities, and the letters did not threaten

63

to sue on it on their behalf. *See First Bank*, 519 S.W.3d at 102. As for Cadbury, the existence of the CQ Agreement matters only to the extent that it can be used to show a motive for Cadbury to prevent Woods and CQuentia from forming a business relationship. *See Faucette v. Chantos*, 322 S.W.3d 901, 914–16 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (setting out the elements for tortious interference with an existing contract and for tortious interference with prospective contractual relations, which includes continuing business relations). But that single contract is not enough to show minimum contacts for Woods's claim. Unlike the letters themselves—which plainly state that Woods could not work for CQuentia if doing so would violate his duties to Cadbury and that Cadbury would sue if CQuentia hired Woods in violation of those duties—the CQ Agreement will not be the focus of the litigation of the claim. *See TV Azteca*, 490 S.W.3d at 52–53. The CQ Agreement (and the fact that it involves a Texas entity) does not have a substantial connection to the operative facts of Woods's claim, and the fact that the agreement is with a Texas entity is merely fortuitous.[43]

---

[43]To the extent that Woods relies on the argument that some of CQuentia's performance of the CQ Agreement was in Texas, there is no allegation or evidence that Cadbury required or bargained for CQuentia to do so. *Contra Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 281 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (upholding personal jurisdiction for contract claims "arising from a contract specifically designed to benefit from the skills of a Texas resident who performs contractual obligations in Texas"). Rather, that was the result of CQuentia's choosing to locate its headquarters there. *Hanor*, 2020 WL 7364659, at *5 (citing *Magnolia Gas Co. v. Knight Equip. & Mfg. Co.*, 994 S.W.2d 684, 692 (Tex. App.—San Antonio 1998, no pet.), *abrogated on other grounds by BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 n.1 (Tex. 2002)). Under the CQ Agreement, Cadbury was selling and marketing CQuentia's lab services, and there was no requirement or expectation for CQuentia to perform

As for the fact that the letters were sent to Texas residents and representatives of a Texas entity, that fact does not meet the standard for purposeful availment because for Cadbury's purposes, it did not matter where Meeker and CQuentia's general counsel were located.  Rather, the fact that the letters were sent to Texas was merely fortuitous because of Meeker's and CQuentia's decision to be located there.  *See Motor Components, LLC v. Devon Energy Corp.*, 338 S.W.3d 198, 205–06 (Tex. App.—Houston [14th Dist.] 2011, no pet.).  Further, the letters were sent only in response to contact from Meeker and from CQuentia's general counsel.  They were not contacts initiated by Cadbury. We therefore overrule the remainder of Woods's fifth issue.[44]

---

those services in Texas; to the contrary, the contract called for those services to be performed elsewhere.  There is evidence that Cadbury relied on some CQuentia employees to provide educational materials and technical support, but for Cadbury's purposes—and for the purpose of proving Woods's claims—the location of those employees was irrelevant.  And the evidence indicates that the idea for Cadbury's and CQuentia's contractual relationship arose not from Rieder's and Rapee's attempts to form a relationship with Texas but from Cadbury's and CQuentia's desire to make a profit by targeting Rieder's and Rapee's contacts for CQuentia's services, none of whom were alleged to be based in Texas.

[44]Woods additionally argues that the trial court erred by dismissing his claims with prejudice, but he raised this argument for the first time in his reply brief.  *See Myers v. Branch Banking & Tr. Co.*, No. 02-19-00080-CV, 2020 WL 1646751, at *4 n.3 (Tex. App.—Fort Worth Apr. 2, 2020, no pet.) (mem. op.) (stating that an issue raised for the first time in a reply brief is ordinarily waived).  Even if we were to consider this argument as fairly included in his opening brief, he failed to raise it in the trial court. *See* Tex. R. App. P. 33.1; *Bridwell v. Mulder*, 315 S.W.3d 657, 659–60 (Tex. App.—Dallas 2010, no pet.) ("[E]rror in dismissing a case with prejudice must be presented to the trial court and cannot be raised for the first time on appeal."); *see also Mann v. Denton Cty.*, No. 02-16-00030-CV, 2017 WL 526309, at *5 n.8 (Tex. App.—Fort Worth Feb. 9, 2017, pet. denied) (mem. op.).  We therefore do not address it.

**D.    Woods's Sixth Issue**

Because the trial court does not have personal jurisdiction over Defendants for any of Woods's claims, we need not address Woods's sixth issue asserting that interests of justice and equity do not counsel against the exercise of jurisdiction over Defendants.

## V.    Severance and Abatement

In Defendants' third issue, they argue that the declaratory judgment claim asserted by Meeker on behalf of CQuentia should be severed and abated from the rest of the lawsuit pending the outcome of the Wisconsin lawsuit.  Because the trial court denied Defendants' motion to dismiss Intervenors' claims, it had no reason to consider Defendants' request to sever the one claim Meeker brought against Cadbury on behalf of CQuentia and abate it pending the Wisconsin suit.  Because we are dismissing all of Intervenors' claims save one, in the interest of judicial economy and in recognition of the trial court's wide discretion in managing its docket, *see Clanton v. Clark*, 639 S.W.2d 929, 931 (Tex. 1982), we decline to order abatement.  But we remand that one claim to the trial court for further proceedings consistent with this opinion and the opinion of the Texas Supreme Court, including considering any request Defendants may raise there to abate proceedings during the pendency of the Wisconsin suit.

## VI.    Conclusion

Having overruled Woods's fifth, seventh, and eighth issues, and having sustained Defendants' first issue and their second issue in part, we affirm the trial court's order in part and reverse it in part.  We affirm the part of the trial court's order granting the

66

special appearance as to and dismissing Woods's claims, and we affirm the part of the order denying the special appearance as to Meeker's declaratory judgment claim on behalf of CQuentia for a declaration with respect to the CQ Agreement. But we reverse the part of the order overruling Defendants' special appearance as to all of Intervenors' remaining claims, and we render judgment dismissing those claims without prejudice. We remand this case to the trial court for further proceedings on the sole remaining claim consistent with this opinion and the opinion of the Texas Supreme Court.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: April 22, 2021